Slip Op. 07-80

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | | |
|---|---|---|---|
| AGFA CORPORATION, | : | Before: | Jane A. Restani, Chief Judge |
| Plaintiff, | : | | |
| v. | : | Court No. | 05-00352 |
| UNITED STATES, | : | | |
| Defendant. | : | | |

**OPINION**

[After trial, subject merchandise found to be classified properly under subheading 3701.30.00, HTSUS.  Judgment for the Defendant.]

Dated: May 21, 2007

Alston & Bird, LLP (Paul F. Brinkman, Jonathan M. Fee, Kenneth G. Weigel, and Michelle L. Turner) for the plaintiff.

Peter D. Keisler, Assistant Attorney General, Barbara S. Williams, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Mikki G. Walser and Jack S. Rockafellow); Michael W. Heydrich, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of counsel, for the defendant.

Restani, Chief Judge: Plaintiff Agfa Corp. ("Agfa") challenges a determination by the U.S. Customs and Border Protection ("Customs"), classifying certain "plates" used in photolithography under subheading 3701.30.00 of the Harmonized Tariff Schedule of the United States 2003 ("HTSUS") as photographic plates. Agfa contends that the merchandise cannot be classified under heading 3701, HTSUS, which covers photographic and cinematographic goods, and instead should be classified under heading 8442, HTSUS, which covers printing type, blocks,

plates, and cylinders. Based on the text of the HTSUS, the definitions provided in the Chapter Notes, and the guidance provided in the Explanatory Notes, the court concludes that the merchandise is classified properly under subheading 3701.30.00, HTSUS, as photographic plates.

## FACTUAL BACKGROUND

Agfa is listed as the owner of record of twenty-six entries of the merchandise at issue, certain "plates," which arrived through the Port of Philadelphia between September 29, 2003, and November 2, 2003.[1] The parties agree that the plates are used in a photomechanical printing process. (Parties' Uncontested Facts, ¶ 23, Schedule C to the Pretrial Order.) The plates are composed of two functional layers: the first is a grained and anodized aluminum substrate, and the second is a photosensitive "polymer or emulsion layer." (Id. at ¶ 10.) Specifically, the parties agree that the plates here are sensitive to specific wavelengths of light. (Id. at ¶¶ 18–22.) As imported, all of the plates are "unexposed" and have at least two sides exceeding 255mm. (Id. at ¶¶ 11–12.)

At trial, Agfa described the photomechanical printing process, specifically photolithography, for which its plates are used. The plates here are used by printers to create copies based on a "proof," usually a digital file on a computer. (Trial Tr. 61:16–62:21, Dec. 11, 2006.) To prepare a plate for use in a printing press, a laser is used to place images from the proof onto the plate. (Id. at 71:5–24). The light from the laser softens the undesired portions of the emulsion while avoiding the areas which compose the desired image.[2] (Id.) The plate is then

---

[1] The plates included five different models: "LAP-V Ultra," "LAP-O Ultra," "N550," "N91," and "N91V." (Parties' Uncontested Facts, ¶ 8, Schedule C to the Pretrial Order.)

[2] It appears that some lasers work on the opposite principle, hardening portions of the emulsion while leaving the rest soft. (Trial Tr. 71:10–24.)

Court No. 05-00352                                                                                      Page 3

washed, removing the softened emulsion layer and exposing the aluminum below. (Id. at 75:1–5.) Once a plate has been exposed, it is bent around a "plate cylinder" and inserted into a printing press. (Id. at 82:11–12, 89:12–24.) As the plate cylinder turns, its surface is exposed to a neighboring cylinder carrying water, and to another carrying ink. (Id. at 145:11–146:5.) The ink adheres only to the portions of the plate that are still covered by the polymer or emulsion layer. (Id.) As the plate cylinder continues to turn, it comes into contact with a "blanket cylinder" which picks up the ink. (Id.) The blanket cylinder then rolls the ink onto paper as it is fed through the press. (Id.) When a printing run is completed, the plate is usually discarded. (Id. at 92:2–6.)

        Upon entry, Customs classified the product under subheading 3701.30.00, HTSUS, as "[p]hotographic plates and film in the flat, sensitized, unexposed, of any material other than paper, paperboard or textiles . . . . [o]ther plates and film, with any side exceeding 255 mm."[3] Agfa filed a protest challenging this classification, claiming that the merchandise should have been classified under subheading 8442.50.10, HTSUS, as "blocks, plates, cylinders and lithographic stones, prepared for printing purposes . . . [p]lates . . . [p]laned, grained, polished or otherwise prepared for engraving or impressing."[4]

---

[3] Subheading 3701.30.00, HTSUS, reads in full:

| | |
|---|---|
| 3701 | Photographic plates and film in the flat, sensitized, unexposed, of any material other than paper, paperboard or textiles; instant print film in the flat, sensitized, unexposed, whether or not in packs: |
| 3701.30.00 | Other plates and film, with any side exceeding 255 mm. |

[4] Subheading 8442.50.10, HTSUS, reads in full:

| | |
|---|---|
| 8442 | Machinery, apparatus and equipment (other than the machine tools of |

Customs denied the protest after determining that photosensitive plates used in lithography were classifiable as "photographic plates" under heading 3701, HTSUS, and not as "printing plates" under heading 8442, HTSUS. (Def.'s Post-Trial Br., Addendum C.) Customs based its denial on a prior classification decision that it had issued to Agfa on March 2, 2004. HQ 967087 (May 25, 2004). In that decision, Customs concluded that Agfa's printing press plates, called Thermostar plates,[5] were classifiable under heading 3701, HTSUS, in large part due to Note 2 to Chapter 37, which stated that:

> In this chapter the word "photographic" relates to the process by which visible images are formed, directly or indirectly, by the action of light or other forms of radiation on photosensitive

headings 8456 to 8465), for type-founding or typesetting, for preparing or making printing blocks, plates, cylinders or other printing components; printing type, blocks, plates, cylinders and other printing components; blocks, plates, cylinders and lithographic stones, prepared for printing purposes (for example, planed, grained or polished); parts thereof:

| | |
|---|---|
| 8442.50 | Printing type, blocks, plates, cylinders and other printing components; blocks, plates, cylinders and lithographic stones, prepared for printing purposes (for example, planed, grained or polished): |
| 8442.50.10 | Plates |
| 8442.50.10.10. | Planed, grained, polished or otherwise prepared for engraving or impressing. |

---

[5] The Thermostar plates contained a layer of grained and anodized aluminum, coated first by a "hydrophobic polymer that is insensitive to light of any wavelength," and then by a thin "thermo-sensitive coating . . . highly sensitive to infrared light." HQ 967087 at 1. "During the image creation process, the top layer undergoes a heat-induced conversion [by] a high-powered laser . . . that removes part of the plate leaving the image to be printed." Id. Like the plates at issue in this case, the Thermostar process used a laser to remove a layer from the plate, exposing selected portions of the layer from which the image would be printed. Unlike the plates in this case, the laser was used to produce high temperatures which removed unwanted portions of the top layer.

Court No. 05-00352                                                                                                    Page 5

surfaces.

Note 2 to Chapter 37, HTSUS.

       Customs determined that the laser process used for Thermostar plates constituted "action of light or other forms of radiation" on a surface "sensitized to react to laser light/radiation." HQ 967087 at 4.  Because the exposed layer was used to print images, Customs concluded that the plates used light, indirectly, to form visible images.  Id.  Applying this logic, Customs determined that Agfa's plates, like the Thermostar plates, were "photographic" and classifiable under heading 3701, HTSUS.  Id.

       Customs also found that such plates were not classifiable under heading 8442, HTSUS, based on an exclusion contained in an Explanatory Note to heading 8442, HTSUS, which provides that "[s]ensitised plates" are classified under heading 3701, HTSUS.  World Customs Organization, Harmonized Commodity Description & Coding System Explanatory Notes, Explanatory Note 84.42, 1503 (3d ed. 2002) ("Explanatory Note(s)").  Thus, Customs concluded that the merchandise in question was not classifiable under heading 8442, HTSUS.  Agfa timely commenced this action challenging Customs's decision, according to the proper procedures.

## JURISDICTION AND STANDARD OF REVIEW

       Agfa filed a protest with Customs pursuant to 19 U.S.C. § 1515 within 90 days of the liquidation of the entries in question.  The protest was denied.  Consequently, the underlying administrative prerequisites to judicial review under 28 U.S.C. § 1581(a) are complete.

       The meaning and scope of a tariff term is a question of law decided by the court. Len-Ron Mfg. Co. v. United States, 334 F.3d 1304, 1308 (Fed. Cir. 2003).  Whether a particular

article falls within the scope of that tariff term is a question of fact. H.I.M./Fathom, Inc. v. United States, 21 CIT 776, 778, 981 F. Supp. 610, 613 (1997). Where the "review of the classification of the goods collapses into a determination of the proper meaning and scope of the HTSUS terms," as in this case, the court reviews the classification decision de novo. Len-Ron, 334 F.3d at 1308 (quoting Aves. in Leather, Inc. v. United States, 317 F.3d 1399, 1402 (Fed. Cir. 2003)).

## DISCUSSION

The classification of merchandise entered into the customs territory of the United States is governed by the General Rules of Interpretation ("GRIs") of the HTSUS. Under GRI 1, the classification analysis begins with the language of potentially applicable headings. Orlando Food Corp. v. United States, 140 F.3d 1437, 1440 (Fed. Cir. 1998). After determining the proper heading, the court looks to the subheadings to find the correct classification for the merchandise. Id. Here, the parties have advanced two HTSUS headings, 3701 and 8442. Thus, the court first determines whether the goods are prima facie classifiable under either of these two headings before examining the proper subheading for the subject merchandise.

GRI 1 states that "classification shall be determined according to the terms of the headings and any relevant section or chapter notes." Subsequent GRIs are to be consulted only if the headings "do not otherwise require" a particular classification. Thus, "'a court first construes the language of the heading, and any section or chapter notes in question, to determine whether the product at issue is classifiable under the heading.'" N. Am. Processing Co. v. United States, 236 F.3d 695, 698 (Fed. Cir. 2001) (quoting Baxter Healthcare Corp. of P.R. v. United States, 182 F.3d 1333, 1337 (Fed. Cir. 1999)); see also Russell Stadelman & Co. v. United States, 242

F.3d 1044, 1048 (Fed. Cir. 2001) ("The first step in properly construing a tariff classification term is to determine whether Congress clearly defined that term in either the HTSUS or its legislative history." (citing Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994))). "When a tariff term is not defined in either the HTSUS or its legislative history, the term's correct meaning is its common or dictionary meaning in the absence of evidence to the contrary." Russell Stadelman, 242 F.3d at 1048. To determine the common meaning of a term, the court may utilize dictionaries and scientific authorities, as well as its own understanding of the term. Lynteq, Inc. v. United States, 976 F.2d 693, 697 (Fed. Cir. 1992); Rollerblade, Inc. v. United States, 282 F.3d 1349, 1352 (Fed. Cir. 2002) ("To determine a term's common meaning, a court may consult 'dictionaries, scientific authorities, and other reliable information sources.'") (quoting C.J. Tower & Sons v. United States, 69 C.C.P.A. 128, 673 F.2d 1268, 1271 (1982)).

In addition to relying on its "own understanding of terms used," and "standard lexicographic and scientific authorities," a court may also look to the Explanatory Notes for guidance. Mita Copystar, 21 F.3d at 1082. "Although not legally binding on the United States, the Explanatory Notes generally indicate the 'proper interpretation' of provisions within the HTSUS." H.I.M./Fathom, 21 CIT at 779, 981 F. Supp. at 613 (quoting Lynteq, 976 F. 2d at 699).

**I.     Heading 3701, HTSUS**

As previously stated, heading 3701, HTSUS, covers "[p]hotographic plates and film in the flat, sensitized, unexposed, of any material other than paper, paperboard or textiles." The parties do not contest that the plates at issue here are flat, sensitized, and unexposed. They also agree that the plates are not composed of paper, paperboard, or textiles. Thus, the remaining

Court No. 05-00352                                                                                                  Page 8

issue is whether the merchandise is a "photographic plate" within the meaning of heading 3701, HTSUS.

A. **"Photographic Plate" is Not a Term of Art and Cannot be Construed Contrary to the Terms of the Chapter Notes**

Agfa claims that the common meaning of photographic plate is "glass substrate that has a silver gelatin emulsion coated on the top."  (Pl.'s Post-Trial Br. 16.)  Agfa asserts that "photographic plate" is a term of art commonly understood as "a sheet of material (as glass or plastic) coated with a light-sensitive photographic emulsion."  (Id. at 6–7 (citation and quotation marks removed).)  According to Agfa, "photographic plates" are "discrete product[s] in the art of photography that have recognized intrinsic value" and are characterized by their rigidity and transparency.  (Id. at 7.)  Agfa argues that because "photographic plate" is a term of art, Chapter Note 2 to heading 3701 is irrelevant to the interpretation of the tariff term "photographic plate."

A "term of art" is  "a 'word or phrase having a specific, precise meaning in a given speciality, apart from its general meaning in ordinary contexts.'"  Faus Group, Inc. v. United States, 358 F. Supp. 2d 1244, 1250 (CIT 2004) (quoting Black's Law Dictionary 1511 (8th ed. 2004)).  Recourse to terms of art is "generally disfavored."  Id.  This is especially so when application of a term of art would circumvent a statutorily provided definition.  For instance, in Faus, the parties claimed that "builders' joinery" was a term of art.  Id.  If so, the term could not be defined by "searching through dictionaries for the words 'builders' and 'joinery.'"  Id.  The court rejected this argument, in part because the relevant Explanatory Notes referred to "joinery" on its own.  Id. at 1251.  The court also noted that it was unaware of any "dictionary or other definitions of 'builders' joinery' as a single term."  Id.  Similarly, the court in

Amity Leather Co. v. United States, 20 CIT 1049, 939 F. Supp. 891 (1996), considered whether the TSUS term "reinforced or laminated plastics" was "an inseparable term of art." Id. at 1053, 939 F. Supp. at 895. The court rejected this argument, finding that the TSUS provided separate definitions for "reinforced plastics" and "laminated plastics." Id. at 1054, 939 F. Supp. at 895.

      The court's reasoning in Faus applies even more strongly in this case. In Faus, the presence of a defined term in the Explanatory Notes counseled against adoption of a term of art. Here, it is a Chapter Note that provides a clear, binding, definition of the term "photographic" as relating "to the process by which visible images are formed, directly or indirectly, by the action of light or other forms of radiation on photosensitive surfaces." Note 2 to Chapter 37, HTSUS. Agfa, however, essentially defines photographic as relating only to the "art of photography," and not as referring to more generally applicable photographic processes. This directly contradicts the broad definition provided by Chapter Note 2. While the court does not treat Explanatory Notes as binding authority, the court is required by GRI 1 to use the Chapter Notes, which are part of the statute, to determine the meaning of tariff headings. See Ciba-Geigy Corp. v. United States, 22 CIT 1155, 1162–63, 44 F. Supp. 2d 207, 213–14 (1999) (adhering to the definition provided in a Chapter Note and rejecting arguments that application of the Chapter Note would lead to an anomaly). Further, in interpreting tariff terms, common meanings, including terms of art, are consulted only after a court examines the HTSUS, tariff headings, section and chapter notes, and legislative history. N. Am. Processing, 56 F. Supp. 2d at 1179; see also Ciba-Geigy, 22 CIT at 1162, 44 F. Supp. 2d at 213 n.6 ("In interpreting tariff headings, it is the tariff definition and specifications, not common or commercial meaning, that is conclusive for classification purposes." (citations omitted)). Thus, Agfa's argument that the court should

Court No. 05-00352                                                                                          Page 10

disregard Chapter Note 2 in favor of a "term of art" understanding is without merit.

Agfa's proposed definition is not only contrary to Chapter Note 2, but it is contrary to heading 3701, HTSUS, itself. Heading 3701, HTSUS, states that plates covered therein can be composed "of any material other than paper, paperboard or textiles." Agfa's proposed definition of "photographic plate" as a rigid and transparent sheet of either glass or plastic places limits upon the heading that are not found within it.[6]

Accordingly, the court rejects Agfa's definition of "photographic plate" as a "discrete product in the art of photography that ha[s] recognized intrinsic value" and is characterized by its rigidity and transparency. (Pl.'s Post-Trial Br. at 7–8.) Instead, the court considers the meanings of the term "photographic" and the term "plate" in order to ascertain the meaning of "photographic plate."

### B.    The Articles in Question Are <u>Prima Facie</u> Classifiable Under Heading 3701, HTSUS

As previously discussed, Chapter Note 2 states that "[i]n this chapter the word '<u>photographic</u>' relates to the process by which visible images are formed, directly or indirectly, by the action of light or other forms of radiation on photosensitive surfaces."[7] Note 2 to Chapter

---

[6] Additionally, the court has not located a definition of "photographic plate" in commonly-available dictionaries. Agfa also has not provided the court with a resource which defines "photographic plate" as a single term. See <u>Faus</u>, 358 F. Supp. 2d at 1251 (noting that "there are no dictionary or other definitions of 'builders' joinery' as a single term," and declining to find a term of art).

[7] Agfa argues that applying this definition of "photographic" would lead to absurd results. Agfa claims that if heading 3701 encompasses all such plates, then "countless products having nothing to do with photography or cinematography would fall within the scope of the 'photographic' goods described in Chapter 37." (Pl.'s Post-Trial Br. 18.) As previously discussed, in so arguing, Agfa ignores the definition of photographic stated in Chapter Note 2. Chapter Note 2 does not mandate that the products covered therein must be used directly in the

Court No. 05-00352 Page 11

37, HTSUS.  The parties here agree that Agfa's plates are coated with a photosensitive "polymer or emulsion layer."  They also agree that a laser is used to "expose" portions of that surface.  "Laser" stands for "light amplification by simulated emission of radiation."  Webster's Third New International Dictionary, 1274 (3d ed. 1981).  While it is evident from the record that the lasers in question do not directly create an "image," the laser is essential in creating the image that will be printed onto paper because it softens or hardens the desired portions of the emulsion, allowing the undesired portions to be washed away.  The court finds that this constitutes the use of light to form a visible image indirectly.

In contrast, the HTSUS, Chapter Notes, and legislative history do not provide a definition of the term "plate."  Rather, the HTSUS heading merely states that plates covered within the heading can be composed "of any material other than paper, paperboard or textiles."  Based on the text of heading 3701, HTSUS, it appears that Congress intended to use a broad definition of plate, encompassing plates composed of a variety of materials.  The HTSUS, however, does not include further information regarding plates and thus, the court turns to dictionaries for additional insight.

Dictionaries indicate that a "plate" can be composed of a variety of materials and used for a variety of purposes.  The McGraw-Hill Dictionary of Scientific and Technical Terms (1974), defines "plate," when used "[i]n photography," as "a sheet of glass coated with a sensitized emulsion."  Id. at 1184.  When used "[i]n printing," a "plate" is defined as "the reproduction of type or cuts in metal or other material; a plate may bear a relief, intaglio, or

---

"art" of photography or cinematography but merely states that goods are photographic if they utilize a "process by which visible images are formed, directly or indirectly, by the action of light or other forms of radiation on photosensitive surfaces."  Note 2 to Chapter 37, HTSUS.

planographic printing surface." Id. A similar distinction is made in The Focal Encyclopedia of Photography (3d ed. 1993), which states that, "among photosensitive materials," a "plate" is "a relatively thick, rigid, transparent support for a photosensitive coating." Id. at 637. The Encyclopedia adds that "[g]lass is the most common material" from which a plate is made, in addition to methyl methacrylate sheets and fused quartz. Id. By contrast, the Encyclopedia provides that "[i]n photomechanical reproduction," a "plate" is "a sheet of metal, plastic, or paper bearing an image for printing with ink." Id. In sum, it appears that plates can be used in photography or in photomechanical reproduction, depending on their composition.

The Explanatory Notes also indicate that heading 3701, HTSUS, covers plates composed of various materials for use in photography and in photomechanical reproduction. While not binding, these notes provide an additional resource for understanding the intent behind particular terms used in the HTSUS. H.I.M./Fathom, 21 CIT at 779, 981 F. Supp. at 613; see also H.R. Rep. 100-576, at 549 (1988) (Conf. Rep.), reprinted in 1988 U.S.C.C.A.N. 1547, 1582 (stating that the Explanatory Notes are "generally indicative of proper interpretation of the various provisions of the Convention"). Here, Explanatory Note A to Chapter 37.01 explicitly states that "for film packs and cut films," the "materials commonly used" are "other plastics," but that "for photomechanical processes," plates are commonly made of "metal or stone." Explanatory Note 37.01, at 660. By specifically mentioning photomechanical processes and the differing plate materials used in photomechanical processes, Explanatory Note A indicates that heading 3701, HTSUS, covers plates that are used in photomechanical processes.

If any doubt remains, the Explanatory Notes also state that "goods [covered in this heading] are put to many uses," including "[p]hotomechanical process plates of the type used for

photoengraving, photolithography, etc." <u>Explanatory Note</u> 37.01, at 660. As previously stated, the parties here agree that the articles in question use photolithography to produce images. Given this specific Explanatory Note, it is evident that heading 3701, HTSUS, covers not only transparent surfaces used to generate photographs but also covers some non-transparent metal or stone surfaces used in engraving and photolithography.[8] See <u>H.I.M./Fathom</u>, 21 CIT at 779, 981 F. Supp. at 613 (stating that Explanatory Notes are "persuasive authority for the Court when they specifically include or exclude an item from a tariff heading").

Accordingly, the court finds that Agfa's plates possess all of the qualities required for <u>prima</u> <u>facie</u> classification under heading 3701, HTSUS.

**II.     Heading 8442, HTSUS**

Agfa claims that its merchandise is classifiable under heading 8442, HTSUS, as "blocks, plates, cylinders and lithographic stones, prepared for printing purposes (for example, planed, grained or polished)." As previously stated, the parties here agree that the photosensitive plates at issue are used in photolithography. Thus, the issue is whether heading 8442, HTSUS, covers photosensitive plates used in photolithography.

Heading 8442, HTSUS, and its Chapter Notes do not address photosensitive plates of the type at issue here and the parties point to no legislative history addressing such. The Explanatory Note to heading 8442, HTSUS, however, does address merchandise of the type at issue here. The Explanatory Note to heading 8442, HTSUS, specifically states that "[s]ensitised

---

[8] Agfa claims that the Explanatory Notes should not be consulted, because the meaning of the statutory text is clear. This statement is difficult to reconcile with its repeated assertion that there is no definition of "photographic plate" in the HTSUS, and that it is necessary to consult expert testimony to establish the meaning of "photographic plate" as a term of art.

Court No. 05-00352　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 14

plates (e.g., consisting of metal or plastics, coated with a sensitised photographic emulsion, or of a sheet of photosensitive plastics, whether or not affixed to a support of metal or other material) are <u>excluded (heading 37.01)</u>." <u>Explanatory Note</u> 84.42, at 1503. Agfa does not dispute that its plates consist of a layer of photosensitive emulsion. Given that Explanatory Notes are "persuasive authority for the Court when they specifically include or exclude an item from a tariff heading," the court holds that the photosensitive plates at issue here are not covered by heading 8442, HTSUS.[9] <u>H.I.M./Fathom</u>, 21 CIT at 779, 981 F. Supp. at 613.

　　　　　Despite the fact that the Explanatory Note to heading 8442, HTSUS, specifically excludes photosensitive plates, Agfa argues that if photosensitive plates are not included in heading 8442, HTSUS, then it would become an "empty tariff provision" because "[n]early all printing press plates contain a photosensitive layer." (Pl.'s Post-Trial Br. 19–20.) The record, however, shows that letter press technology, which is still in limited use, and mechanical gravure do not utilize a photosensitive layer. (Trial Tr. 86:16–21, 87:24–88:6.) Thus, although heading 8442 may arguably be a less utilized provision and will likely become even less used because it

---

[9]Agfa argues that Customs's position cannot be reconciled with this Court's ruling in <u>Brother Int'l Corp. v. United States</u>, 26 CIT 867, 248 F. Supp. 2d 1224 (2002). In <u>Brother International</u>, the court held that printing cartridges were not classifiable as photographic film even though they contained a role of chemically treated film. <u>Id.</u> at 875–76, 248 F. Supp. 2d at 1232. The court found that unlike photographic film, the printing cartridges were not the material on which a facsimile machine operates, were not the output of the facsimile machine, and once used, had no intrinsic value but were discarded. <u>Id.</u> at 876–77, 248 F. Supp. 2d at 1233. The court concluded that the printing cartridges are instead classified properly as part of a facsimile machine because they are an integral part of the facsimile machines that use them and are designed and constructed exclusively for use in certain facsimile machines. <u>Id.</u> at 873, 248 F. Supp. 2d at 1229–30.
　Unlike the present case, however, <u>Brother International</u> did not concern two separate Explanatory Notes from two different headings which excluded the subject merchandise from one heading and included the subject merchandise in the other heading.

does not cover processes which now dominate the printing industry, <u>id.</u> at 83:24–84:2, heading 8442, HTSUS, is not an "empty tariff provision."[10] The court also notes that the HTSUS was enacted at a set point in time. If the international drafters wish to adapt to changes, they will, and presumably Congress will enact the changes. The court, however, must apply the HTSUS as it is now.

Accordingly, the subject merchandise is not <u>prima facie</u> classifiable under heading 8442, HTSUS.

C.      **Subheading 3701.30.00, HTSUS**

After concluding that the photosensitised plates at issue are properly covered by heading 3701, HTSUS, the court also finds that subheading 3701.30.00, HTSUS, covering "[p]hotographic plates and film in the flat, sensitized, unexposed, of any material other than paper, paperboard or textiles; instant print film in the flat, sensitized, unexposed, whether or not in packs: [o]ther plates and film, with any side exceeding 255 mm," is the proper classification for the subject merchandise.

---

[10] Similarly, Agfa claims that the Explanatory Notes to heading 8442, HTSUS, are internally inconsistent and should be disregarded. Here, Explanatory Note 84.42 first states that heading 8442 includes "[o]ffset printing plates of zinc or aluminum . . . on which the design is reproduced in the flat," <u>Explanatory Note</u> 84.42, at 1503, and then later states that "[s]ensitised plates . . . are <u>excluded</u>," id. Agfa argues that the Explanatory Note is internally inconsistent because all printing plates today are sensitised and thus, no offset printing plates would be included under heading 8442, HTSUS. (Pl.'s Post-Trial Br. 24.) Agfa's argument is inconsistent with an earlier statement in its brief that "nearly all" and not all printing plates contain a photosensitive layer. (<u>Id.</u> at 20.) Further, as discussed above, the record does not show that all printing plates contain a photosensitive layer.

## CONCLUSION

For the foregoing reasons, Customs' classification of the subject merchandise under subheading 3701.30.00, HTSUS, is sustained.  Judgment is entered for the defendant.

                                                                    /s/ Jane A. Restani
                                                                Jane A. Restani
                                                                Chief Judge

Dated: This 21st day of May, 2007.
           New York, New York.

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| AGFA CORPORATION, | |
| Plaintiff, | |
| v. | Before: Jane A. Restani, Chief Judge |
| UNITED STATES, | Court No. 05-00352 |
| Defendant. | |

## JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED that classification of the subject merchandise under subheading 3701.30.00, HTSUS (2003), is sustained. Judgment is entered for the Defendant.

          /s/ Jane A. Restani
Jane A. Restani
Chief Judge

Dated: This 21st Day of May, 2007.
      New York, New York.

## NOTICE OF ENTRY AND SERVICE

  This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

  Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

                or

  Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

                          Tina Potuto Kimble
                          Clerk of the Court

Date: _____  By: _____
                       Deputy Clerk